# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Jela D. Jones, as Trustee for the heirs of
Brenda Diane Jones, deceased,

                         Plaintiff,

                                        Civ. No. 05-1249 (RHK/AJB)
                                   **MEMORANDUM OPINION AND
                                   ORDER**

v.

Minnesota Department of Corrections, *et al.*,

                         Defendants.

Bradley A. Kirscher, Aase & Kirscher, PLLC, St. Paul, Minnesota, for Plaintiff.

Jennifer A. Service, Assistant Attorney General, St. Paul, Minnesota, for Defendants.

## INTRODUCTION

This action arises out of the death of Brenda Jones at the Minnesota Correctional

Facility – Shakopee ("MCF-SHK") on November 7, 2003.  Plaintiff Jela D. Jones, Brenda

Jones's son, asserts that Defendants were deliberately indifferent to Brenda Jones's serious

medical needs and that such indifference caused his mother's death.[1]  He also asserts an

excessive-force claim and a state-law wrongful death claim.  Defendants now move for

summary judgment.  For the reasons set forth below, the Court will grant the Motion.

---

[1] Hereafter, Brenda Jones is referred to as "Jones" and Jela Jones is referred to as "Plaintiff."

## BACKGROUND

On November 4, 2003, Jones was sentenced to 33 months in prison for aiding and abetting a controlled substance crime.  (Kirscher Aff. Ex. L at 4.)  Upon being sentenced, Jones was transported to the Blue Earth County Jail (the "Jail") in Mankato, Minnesota, where she spent three days prior to being transported to MCF-SHK, a state prison located in Shakopee, Minnesota.  (Id. at 7.)  On arrival at the Jail, Jones complained of a backache and signed a medical release form for treatment, but she did not report any other medical problems.  (Id.)

On November 6, 2003, Jones's cellmates reported that Jones had a bloody nose.  (Id.)  Jail staff checked on Jones and found her lying on her back with dried blood on her nose and a bloody tissue lying on her bunk; Jones, however, was "unable to explain what was wrong."  (Id.)  Jones's cellmates complained to Jail staff that Jones was "getting sicker," but Jones repeatedly denied being sick to Jail personnel.  (Id.)  Jones was checked on several times during the remainder of the evening, and each time she was asked how she was feeling.  (Id.)  Jones nodded and said that she was "OK" in response to each query.  (Id.)

During the early morning hours on November 7, 2003, Jones was informed that she would be transported to MCF-SHK later that day.  (Id.)  Upon learning of her impending transfer, Jones stated that she could not walk on her own, and she "seemed to be hyperventilating."  (Id.)  Jones eventually got dressed with the help of Jail officers, walked

into a hallway, and got into a restraint chair.[2]  (Id.)  Her vital signs were taken; her blood

pressure was 110/58, her temperature was 95.8, and her pulse was 64, all of which Jail staff

found to be "normal."  (Id.)  Although Jones was "a little out of breath," Jail staff assumed it

was because she had been "attempting to walk."  (Id.)[3]

Before Jones was transported, Jail staff contacted officers at MCF-SHK and

informed them that Jones had been "fine" until being advised of her transfer, at which point

she became "violently ill" and "uncooperative."  (Id.; Hedtke Dep. Tr. at 11-12; Fors Dep.

Tr. at 10.)  They further suggested that MCF-SHK have several staff members available to

assist Jones from the transport vehicle.  (Kirscher Aff. Ex. L at 7.)  MCF-SHK Sergeant

Troy Hedtke made arrangements to have several officers present when Jones arrived.

(Hedtke Dep. Tr. at 12; Fors Dep. Tr. at 10-11.)

At approximately 9:45 a.m. on November 7, 2003, Jones arrived at MCF-SHK in a

Blue Earth County transport vehicle.  (Westphal Dep. Tr. at 20.)  The vehicle parked in

MCF-SHK's intake garage; four corrections officers, including Sergeant Hedtke, met the

vehicle there.  (Id. at 23; Ziegler Dep. Ex. 9.)  Sergeant Hedtke and Corrections Officer

David Knutson observed Jones in the back seat of the vehicle but noted nothing unusual in

her appearance.  (Knutson Dep. Tr. at 15; Hedtke Dep. Tr. at 16.)  Nevertheless, when they

repeatedly asked Jones to exit the vehicle, she met their requests with blank stares or

---

[2] Jail staff apparently wanted to put Jones in a wheelchair, but for unknown reasons "a wheelchair could not be used."  (Kirscher Aff. Ex. L at 7.)

[3] According to Jones's autopsy report, Jones was "morbidly obese."  (Kirscher Aff. Ex. S at 1.)  She was 5'1" tall and weighed 285 pounds at the time of her death.  (Id. at 3.)

3

mumbles.  (Knutson Dep. Tr. at 13-15; Hedtke Dep. Tr. at 14.)[4]  Knutson then climbed into

the back seat and began to push Jones out of the vehicle while Sergeant Hedtke pulled from

the outside.  (Knutson Dep. Tr. at 13, 15-18.)  Jones attempted to assist the officers by

swinging her legs outside of the vehicle and giving her hands to Sergeant Hedtke.  (Knutson

Dep. Tr. at 16-17; Hedtke Dep. Tr. at 16.)  Eventually, they succeeded in removing Jones

from the vehicle; she stood for a few seconds and then sat down on the intake garage floor.

(Knutson Dep. Tr. at 18.)[5]

Sergeant Hedtke then requested medical assistance and that a wheelchair be brought

into the intake garage; he also contacted the watch commander, Lieutenant Laura Westphal.

(Knutson Dep. Tr. at 19, 21; Hedtke Dep. Tr. at 17.)  He directed Jones to stand up, but she

remained on the floor, mumbling.  (Knutson Dep. Tr. at 19-20.)  She did not appear to have

any injuries, although she was taking "heavy" breaths.  (Knutson Dep. Tr. at 32.)[6]  Sergeant

Hedtke then directed Knutson to apply pressure to Jones's mandibular angle in an attempt

to get her to comply with his command to get off of the floor.  (Knutson Dep. Tr. at 25-26;

---

[4] It is not uncommon for inmates to refuse to exit transport vehicles upon arrival at MCF-SHK. (Knutson Dep. Tr. at 13.)

[5] Several officers, including Knutson, testified that Jones smelled of urine and/or feces; however, it is not uncommon for offenders arriving from county jails to have such odors.  (Westphal Dep. Tr. at 129-31; Prescott Dep. Tr. at 16.)

[6] Knutson testified that Jones's breaths were "[h]eavy, like an obese person."  (Knutson Dep. Tr. at 32.)  He further testified that he had previously been overweight and that Jones's breaths "sounded like I used to sound."  (Id.)

Hedtke Dep. Tr. at 22.)[7]  The technique proved ineffective; in fact, Jones did not respond at all.  (Knutson Dep. Tr. at 26.)

Lieutenant Westphal then entered the intake garage and observed Jones rolling around on the garage floor, "making grunting noises and breathing hard."  (Kirscher Aff. Ex. Q.)  However, it did not appear to the officers in the intake garage that Jones was having difficulty getting enough air to breathe.  (Knutson Dep. Tr. at 32; Hedtke Dep. Tr. at 61; Hergott Dep. Tr. at 24-25; Fors Dep. Tr. at 20.)  Lieutenant Westphal informed Jones who she was and told Jones that she would suffer consequences if she did not stand up and cooperate with the intake process.  (Kirscher Aff. Ex. Q.)  Jones responded "yes, yes" and attempted to stand up; she did so successfully, with the assistance of several officers.  (Id.; Fors Dep. Tr. at 23; Westphal Dep. Tr. at 29; Knutson Dep. Tr. at 24.)  Jones was then wheeled into the intake area, but none of the cells there could accommodate the wheelchair; Jones was then taken into another unit of MCF-SHK, the "Mead" unit.  (Westphal Dep. Tr. at 31-32.)  Lieutenant Westphal then contacted MCF-SHK's medical director, Caroline Ledin, and spoke with her about Jones's behavior.  (Westphal Aff. Ex. A; Westphal Dep. Tr. at 32-35.)

Upon her arrival at the Mead unit, medical staff was called to perform an examination of Jones.  (Westphal Dep. Tr. at 31-35.)[8]  Pam Smith, a registered nurse, came

---

[7] The mandibular angle is a pressure point behind the ear.  (Knutson Dep. Tr. at 25.)

[8] All new intakes at MCF-SHK are required to undergo a medical examination within 24 hours of arrival.  (Westphal Aff. Ex. D.)  Defendants argue that Lieutenant Westphal requested an earlier evaluation of Jones because of her behavior (Def. Mem. at 4), but the record does not support that

to Jones's cell to conduct that examination.  (Westphal Dep. Tr. at 37; Smith Aff. ¶ 2.)

Smith attempted to take Jones's vital signs, including her blood pressure, but Jones was

uncooperative; Smith succeeded only in obtaining Jones's respiration rate and pulse rate.

(Smith Aff. ¶ 2 & Exs. A-B.)  Additionally, Jones only grunted in response to Smith's

health-related questions and "appeared to be uncomfortable."  (Id. ¶ 2 & Ex. 2.)  However,

when Smith asked Jones if she wanted a glass of water, Jones replied: "I want some water."

(Id. ¶ 2.)  Jones drank that glass of water and then drank another.  (Id. ¶ 4 & Ex. 2.)  Smith

noted that there was some blood in Jones's mouth and on her lips, but Jones never indicated

that she was in pain, nor did she ever request medical assistance.  (Id. ¶ 6 & Ex. 2.)[9]

Moreover, Jones was breathing rapidly at the beginning of the examination and appeared

anxious, but (according to Smith) she calmed down and her breathing had slowed by the end

of the examination.  (Id. ¶ 3.)[10]  By the end of her (abbreviated) examination, Smith did not

perceive that Jones suffered from any "apparent heart problems."  (Id. Ex. 2.)  She therefore

decided to wait to complete a full medical examination until such time as Jones would be

more cooperative, which she hoped would be in "a day or so."  (Id. Exs. A-B.)

_____

assertion.

   [9] Lieutenant Westphal testified that Jones had "chapped, cracked lips."  (Westphal Dep. Tr. at 83.)  This is consistent with Jones's autopsy report, which notes several small cuts on Jones's lips.  (Kirscher Aff. Ex. S at 3.)

   [10] Smith's medical notes from the examination list only one respiratory rate.  Smith states that the respiratory rate in her notes reflect Jones's respiratory rate at the beginning of the examination.  (Smith Aff. ¶ 3.)

After Smith completed her abbreviated intake evaluation of Jones, she spoke to

Lieutenant Westphal.  (Westphal Dep. Tr. at 49.)  Lieutenant Westphal also spoke to

another MCF-SHK nurse, Jane Lacina, about Jones; Lacina had spoken to Smith about the

results of her examination, and she had been advised by Jail staff that Jones had not

exhibited any medical problems prior to being informed of her transfer to MCF-SHK.  (Id.

at 40-41, 49.)  Both Smith and Lacina informed Lieutenant Westphal that, in their opinions,

Jones was capable of going through the normal MCF-SHK intake process.  (Id. at 49, 51.)

Lieutenant Westphal then went to the Mead unit and spoke with Jones; she informed

Jones of the information that the Jail had provided and that she expected Jones to cooperate

with the remainder of the intake process.  (Westphal Aff. Ex. A; Westphal Dep. Tr. at 42.)

Jones stated that she understood and that she would cooperate.  (Id. at 42-43.)  Lieutenant

Westphal then left the area while another officer on duty, Marla Prescott, was contacted

and asked to come to Jones's cell.  (Westphal Dep. Tr. at 61; Prescott Dep. Tr. at 12-13.)

Upon arriving in Jones's cell, Prescott explained MCF-SHK's intake procedures,

which include an unclothed body search.  (Id. at 16-17.)  Jones responded to Prescott's

explanation of the body search by saying: "You want me to do what?"  (Id.)  Prescott

reiterated that Jones needed to be unclothed for a search, and Jones then removed one of

her arms from the Jail uniform she was wearing.  (Id.)  She then stopped undressing and

made no further effort to do so.  (Id. at 17, 19.)  Prescott did not perceive that Jones was

suffering from any type of acute medical problem.  (Id. at 15.)

Because Jones was not complying with the order to remove her clothes for the body search, Lieutenant Westphal was contacted; she ordered Jones transferred to another area of MCF-SHK, the Higbee Segregation Unit.  (Westphal Dep. Tr. at 63; Kirscher Aff. Ex. O.)  Once in the Higbee Segregation Unit, Corrections Officer Kathy Duklet attempted to get Jones to undress.  (Duklet Dep. Tr. at 11.)  Jones moved to the front of her wheelchair and attempted to stand, but was unsuccessful.  (Id.)  She also stated that her feet hurt and that she wanted to remove her socks.  (Id.; DVD.)[11]  Duklet helped Jones remove her socks and did not notice any swelling on Jones's feet.  (Duklet Dep. Tr. at 12.)  Jones did not appear to Duklet to be in need of medical attention, nor did she request medical assistance (other than commenting about pain in her feet).  (Id. at 13.)

Lieutenant Westphal – who had come to the Higbee Segregation Unit and was observing Jones's behavior – informed Jones that a staff-assisted body search would be performed if Jones did not voluntarily undress.  (Westphal Dep. Tr. at 89-91.)[12]  In response, Jones slid forward on the wheelchair and tried to stand, but then leaned back and made no further effort to stand up.  (Westphal Dep. Tr. at 89-91; DVD.)  Several officers then entered Jones's cell and told her that they were going to move her onto the cell's cot; they informed Jones that they were going to lift her up, and she nodded in response.  (Fors

---

[11] Portions of Jones's intake were videotaped by MCF-SHK personnel.  Plaintiff has submitted on DVD a copy of that videotape; the DVD is attached to the Placeholder for Conventionally Filed Affidavit of Bradley Kirscher (Doc. No. 53) and is referred to herein as the "DVD."

[12] MCF-SHK procedures require a staff-assisted, unclothed body search to be performed when an offender will not voluntarily undress to be searched.  (Westphal Aff. Ex. C.)

Dep. Tr. at 31; DVD.)  The officers then lifted Jones out of the wheelchair and onto the cot.

(DVD.)  The male officers then left the cell and three female officers entered and held

Jones down on the bed.  (Id.)  A fourth female officer cut Jones's Jail uniform off of her

body, and all four officers participated in the unclothed body search.  (Id.)  Jones moaned

while being held down on the cot.  (Id.)  After the body search was completed, and pursuant

to MCF-SHK policy, Smith came into Jones's cell and examined her for injuries resulting

from the search.  (Smith Aff. ¶ 9 & Ex. B.)  Smith did not note any injuries.  (Id.)

　　　　Later that day, Corrections Officer Jane Eskelson brought food to Jones and found

her in her cot, lying on her side and using her Higbee Segregation Unit uniform as a blanket.

(Eskelson Dep. Tr. at 19-20.)  Eskelson spoke to Jones and told her to get dressed.  (Id. at

24; Kirscher Aff. Ex. P.)  Jones said "Okay, okay"; she did not indicate that she was having

any type of medical problem.  (Eskelson Dep. Tr. at 24.)  Eskelson later asked Smith to

check on Jones because another corrections officer had informed her that Jones was

making groaning noises, but Smith declined, stating that she had already checked on Jones

during the day.  (Id. at 35.)[13]  Eskelson listened to Jones through the cell's intercom and

heard Jones moaning.  (Kirscher Aff. Ex. P.)  She asked Jones what was wrong but got no

response.  (Id.)  Eskelson then checked on Jones every half-hour for the remainder of her

shift; each time, it appeared that Jones was resting.  (Id.)

---

[13] Eskelson later sent e-mails to two other corrections offers stating "[t]his new one on the bed
– no one cares" and that medical staff was "refusing" to see Jones.  (Kirscher Aff. Ex. T.)

At 9:03 p.m., Eskelson checked on Jones and found that she had not moved since her last check. (Id.) Eskelson entered Jones's cell and found her unresponsive and gray in color. (Id.) Medical staff was summoned, who performed CPR, but Jones could not be revived. (Id.) Jones was pronounced dead at 9:35 p.m. (Id.)

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

Plaintiff asserts three claims in his Complaint: an Eighth Amendment claim due to Defendants' deliberate indifference to Jones's medical needs; an Eighth Amendment

10

excessive-force claim concerning the staff-assisted, unclothed body search; and a state-law

wrongful death claim.  (Sec. Am. Compl. ¶¶ 20-26.)[14]  As set forth in more detail below,

Defendants are entitled to summary judgment on the two federal claims, and the Court

declines to exercise supplemental jurisdiction over the state-law claim.

## I.      The claims against the Department of Corrections and the individual
##         Defendants in their official capacities must be dismissed.

Defendants first argue that the Eleventh Amendment bars the claims against the

Minnesota Department of Corrections (the "DOC").  (Def. Mem. at 9.)  Defendants are

correct.  The Eleventh Amendment "immunizes an unconsenting state from damage actions

brought in federal court."  Hadley v. N. Ark. Cmty. Technical Coll., 76 F.3d 1437, 1438

(8th Cir. 1996).  Here, Plaintiff concedes that the Eleventh Amendment bars his federal

claims against the DOC, but argues that his state-law claim against the DOC is not barred.

(Mem. in Opp'n at 2.)  Eleventh Amendment immunity, however, extends to all claims for

money damages asserted against a state in federal court, including tort claims brought under

state law.  See, e.g., Hoeffner v. Univ. of Minn., 948 F. Supp. 1380, 1385 (D. Minn. 1996)

(claims for, inter alia, negligence, battery, and false advertising barred by Eleventh

Amendment); DeGidio v. Perpich, 612 F. Supp. 1383, 1389 (D. Minn. 1985) (Eleventh

---

[14] There are no separate "counts" pled in Plaintiff's Second Amended Complaint.  It is clear from Plaintiff's Memorandum in Opposition, however, that these are the three claims upon which he seeks relief.  (See Mem. in Opp'n at 1-2.)

Amendment applied to Section 1983 claims and pendent state-law tort claims).

Accordingly, all of the claims against the DOC must be dismissed.[15]

Although it has not been addressed by the parties, the Court also notes that Plaintiff

has sued each of the individual Defendants in both their official and individual capacities.

However, "suits against state officials in their official capacity . . . should be treated as suits

against the State." Hafer v. Melo, 502 U.S. 21, 25 (1991).  Accordingly, to the extent that

Plaintiff has sued each individual Defendant in his or her official capacity, those claims

also are barred by the Eleventh Amendment.  Id.[16]

## II.    The Eighth Amendment claims against the individual Defendants fail.

The individual Defendants next argue that Plaintiff's Eighth Amendment claims fail

because Plaintiff cannot demonstrate that the individual Defendants violated Jones's clearly

---

[15] Although Plaintiff has sued the DOC and not the state of Minnesota, Eleventh Amendment immunity applies to an instrumentality of a state that acts as an "arm of the state." Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977).  Plaintiff has not argued that the DOC is not an "arm" of Minnesota for Eleventh Amendment purposes, and this Court has previously concluded that it is. See, e.g., Damron v. Fabian, No. 04-3685, 2006 WL 839507, at *10 (D. Minn. Mar. 30, 2006) (Kyle, J., adopting Report and Recommendation of Erickson, M.J.); see also Hadley, 76 F.3d at 1438 (state instrumentalities are arms of state under Eleventh Amendment if controlled by state and if state funds would be used to satisfy adverse judgment).  Nor has Plaintiff argued that the DOC has waived its Eleventh Amendment immunity.

[16] Defendant Hillengass, the associate warden at MCF-SHK on the date of Jones's death, argues that he cannot be held liable because Plaintiff's claims against him are predicated on the doctrine of *respondeat superior*.  (Def. Mem. at 9-10; Reply Mem. at 1-2.)  In response, Plaintiff argues that Hillengass tacitly authorized the constitutional violations at issue.  (Mem. in Opp'n at 27.)  Because the Court concludes that Jones's constitutional rights were not violated, it need not reach this argument.

established constitutional rights.  (Def. Mem. at 10-15; Reply Mem. at 2-6.)[17]  The Court agrees.

### A.      The deliberate-indifference claim

"Deliberate indifference" to a prisoner's serious illness or injury constitutes cruel and unusual punishment under the Eighth Amendment of the Constitution.  Estelle v. Gamble, 429 U.S. 97, 104 (1976); Vaughn v. Greene County, 438 F.3d 845, 850 (8th Cir. 2006) ("[i]t is well established that the Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs").   "Deliberate indifference has both an objective and a subjective component." Butler v. Fletcher, __ F.3d __, 2006 WL 2920570, at *4 (8th Cir. Oct. 13, 2006).  The objective component requires a plaintiff to demonstrate that he or she had an objectively serious medical need.  Grayson v. Ross, 454 F.3d 802, 808 (8th Cir. 2006); Moore v. Jackson, 123 F.3d 1082, 1086 (8th Cir. 1997).  The subjective component requires a plaintiff to show that the defendant actually knew of, but disregarded, the plaintiff's serious medical need.  Grayson, 454 F.3d at 808-09; Moore, 123 F.3d at 1086.  Here, Plaintiff's claim fails on both counts.

### 1.      Jones did not suffer from an "objectively serious medical need"

---

[17] For this same reason, the individual Defendants argue that they are entitled to qualified immunity; a state official is entitled to qualified immunity if the official did not deprive the plaintiff of his or her constitutional rights.  See, e.g., Vaughn v. Greene County, 438 F.3d 845, 850 (8th Cir. 2006).

A medical condition constitutes an objectively serious medical need when it (1) has been previously diagnosed by a physician as requiring treatment or (2) is "so obvious that even a layperson would recognize the necessity for a doctor's attention." Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997) (quoting Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995)); accord Grayson, 454 F.3d at 809. In the instant case, Plaintiff proceeds under the second prong – he argues that "the warning signs that . . . Jones needed medical attention were so obvious that the prison officials must have known that she was suffering from a serious medical problem." (Mem. in Opp'n at 18.) The "warning signs" that Plaintiff points to as "obvious" are (1) Jones's breathing difficulties and (2) her "inability to function." (Mem. in Opp'n at 18.) No reasonable jury could conclude, however, that these "warning signs" – either individually or collectively – were "obvious" indicators that Jones required immediate medical attention.

With respect to Jones's breathing issues and as discussed in more detail above, at no point did Jones appear to be gasping for air or otherwise struggling to breathe. Rather, she was simply taking "heavy" and rapid breaths, which would not be unexpected for someone of Jones's size when physically exerting herself. Nor would such heavy or rapid breathing be unexpected of someone suffering anxiety and stress, as Jones clearly was when she was transferred to MCF-SHK – indeed, Jail staff advised MCF-SHK that Jones had been fine up until being told that she was to be transferred, and only then became "violently ill." Most

14

critically, Jones never advised any of her jailers that she was having trouble breathing.[18]

Simply put, Jones's increased respiratory rate was not an "obvious" warning sign that Jones

had a serious medical need requiring immediate attention.

Similarly, the evidence does not support the conclusion that Jones's "inability to

function" was an obvious warning sign that Jones was suffering from a serious medical need

– in fact, the evidence in no way supports Plaintiff's assertion that Jones was "unable" to

function.  Rather, the evidence shows that Jones communicated intelligibly with MCF-SHK

staff off-and-on throughout the time that she was incarcerated and that she understood the

commands they gave her – for example, she attempted to stand when directed to do so and

removed her arm from her Jail uniform when instructed to disrobe.  Moreover, MCF-SHK

personnel had been advised that Jones had been acting normally until being advised of her

transfer.  Given these facts, there simply was no reason for the individual Defendants to

conclude that Jones was "unable" to function or that such purported "inability" indicated

that Jones was in acute medical distress.

---

[18] Plaintiff might attempt to argue that Jones's "inability to function" rendered it impossible for her to advise her jailers that she was unable to breathe.  The record, however, clearly indicates that Jones communicated with MCF-SHK staff throughout her short period of incarceration.  For example, Jones said "yes, yes" and attempted to stand up when Lieutenant Westphal informed her that she would suffer consequences if she did not cooperate during intake; asked Smith for water; told Lieutenant Westphal that she would cooperate while in the Mead unit; said "you want me to do what?" when told she needed to undress for a body search; asked to remove her socks and stated that her feet hurt; and said "Okay, okay" when Eskelson told her to get dressed.

In addition, the Court notes that Jones had been certified to work as a nursing assistant prior to her incarceration.  (Kirscher Aff. Ex. L at 4.)  It would be expected that someone with even minimal medical training would report a serious health problem to medical personnel.

Plaintiff argues that Smith should have known of Jones's serious medical need because she was aware that Jones "appeared uncomfortable, had a high respiration rate, was grunting, had blood in her mouth, and was not speaking to or cooperating with staff." (Mem. in Opp'n at 19.)[19]  This argument fails for two reasons.

First, the argument is based on a mischaracterization of the record, insofar as Plaintiff contends that Jones was not "speaking to or cooperating with staff."  The evidence clearly establishes that Jones communicated with MCF-SHK personnel, albeit on a sporadic basis.  The evidence also establishes that Jones attempted to cooperate with MCF-SHK personnel on more than one occasion.

Second, for the reasons set forth in more detail above, the innocuous conclusions that Smith reached about the causes of Jones's discomfort, respiration rate, grunting, and bloody lips and mouth were perfectly reasonable under the circumstances – namely, Jones's obvious agitation and the fact that Jones apparently had been fine until being advised of her transfer.  See Maxton v. Johnson, 488 F. Supp. 1030, 1037 (D.S.C. 1980) (plaintiff failed to show that painful stomach spasms constituted serious medical need when viewed in light of fact that plaintiff had been on hunger strike); cf. Coleman, 114 F.3d at 784 (plaintiff had obvious serious medical need where she exhibited vaginal bleeding,

_____

[19] Plaintiff also asserts that the record supports "a reasonable inference" that Smith "had observed and was aware that . . . Jones had urinated on herself, that her eyes were bulging and moving rapidly, and that she was unable to stand or speak coherently."  (Mem. in Opp'n at 18.)  Plaintiff fails to point to the evidence allegedly supporting that inference, however, and Smith's notes of her examination of Jones nowhere document these purported issues.

discharge, and abdominal and low-back pain).  At best, Plaintiff has shown that Smith was

negligent in evaluating Jones's medical condition, but negligence – even gross negligence –

is not enough to establish a claim for deliberate indifference.  Gibson v. Weber, 433 F.3d

642, 646 (8th Cir. 2006).[20]

Simply put, Plaintiff has failed to show that Smith should have been aware of Jones's

purported "serious medical need."  Plaintiff's similar arguments vis-a-vis Sergeant Hedtke

and Lieutenant Westphal fail for the same reason.  (See Mem. in Opp'n at 20-22.)

### 2.      The individual Defendants did not disregard Jones's alleged "serious medical need"

The subjective component of Plaintiff's deliberate-indifference claim requires

Plaintiff to show that the individual Defendants knew of, but disregarded, Jones's serious

medical need.  Grayson, 454 F.3d at 808-09; Moore, 123 F.3d at 1086.  In other words,

Plaintiff must show that each of the individual Defendants acted with a "highly culpable

state of mind approaching actual intent."  Choate v. Lockhart, 7 F.3d 1370, 1373 (8th Cir.

1993).  The evidence clearly demonstrates that the individual Defendants did not disregard

Jones's purported serious medical needs.

At the outset, the Court notes that Plaintiff's claim fails because he has not shown

that the individual Defendants knew that Jones suffered from a serious medical need.

---

[20] Notably, Plaintiff's own expert, Dr. Barbara Bellar, testified that the individual Defendants' actions – including Smith's – were deliberately indifferent only because she believed that they were negligent.  (Bellar Dep. Tr. at 48 ("[M]aybe I think negligence is deliberate.  If you are not doing the right thing, then you are doing the opposite; and you must be making a choice or a decision or an intention if that fits with deliberate.").)

Accordingly, the individual Defendants cannot have purposely disregarded that need *ipso*

*facto*.  Grayson, 454 F.3d at 809 (defendant could not have been deliberately indifferent

when he was not aware of plaintiff's need for medical attention).  Plaintiff's allegation that

the individual Defendants *should have known* about Jones's serious medical need does not

save the claim, because "[a]n official's failure to alleviate a significant risk that he should

have perceived but did not, while no cause for commendation, cannot . . . be condemned"

under the Eighth Amendment.  Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Regardless, even if Plaintiff were correct that Jones suffered from a serious

medical need *and* that the individual Defendants were aware of that need, the record does

not support the conclusion that the individual Defendants disregarded it.  The undisputed

facts establish that, based upon information provided by the Jail, Sergeant Hedtke made

sure that several staff members were available to assist him when Jones's transport vehicle

arrived.  After Jones did not respond to his commands to exit the vehicle and he had to

physically remove her from the back seat, Sergeant Hedtke called for medical assistance

and for a wheelchair to be brought into the intake garage.  Lieutenant Westphal, upon being

advised of the situation, came to the intake garage to observe and, after Jones was in the

wheelchair, spoke with MCF-SHK's medical director about Jones's behavior.  After Jones

was wheeled to the Mead unit, Smith – a Registered Nurse – examined her and concluded

(albeit through a brief examination) that there were no immediate concerns with Jones's

health.  Lieutenant Westphal then spoke with Smith and Lacina – another Registered Nurse

– about Jones and determined that she was able to continue with the intake process.  Simply

put, these facts are inconsistent with the conclusion that the individual Defendants deliberately disregarded a serious risk to Jones's health.  See Logan v. Clarke, 119 F.3d 647, 650 (8th Cir. 1997) (fact that prison officials undertook some effort to remedy plaintiff's pain, "while perhaps not as extensive as those a private health-care provider might have taken, did not reflect deliberate indifference" to plaintiff's medical needs).

Of equal importance is the fact that Jail personnel suggested that Jones was feigning illness and that each of the individual Defendants honestly believed that to be the case – indeed, Plaintiff has not directed the Court to any evidence indicating that the individual Defendants did not truly believe that Jones was faking infirmity.  As one court has noted, "medical personnel . . . are not liable if they honestly believed the inmate was malingering." Price v. Cooper, No. 94 C 5142, 1996 WL 467242, at *3 (N.D. Ill. Aug. 12, 1996); accord Todd v. Walters, 166 Fed. Appx. 590, 592, 2006 WL 73132, at *2 (3d Cir. 2006) (deliberate indifference claim failed where, *inter alia*, defendants believed that plaintiff was malingering); Hughes v. Joliet Corr. Ctr., 931 F.2d 425, 428 (7th Cir. 1991) (noting that the plaintiff's Eighth Amendment claim would fail if defendant doctors "were merely careless in their diagnosis and treatment of [the plaintiff,] being honestly convinced that he was a malingerer, as the medical reports in [his] file . . . state[d]").

The best evidence that Plaintiff can point to in order to support his claim is Smith's refusal to examine Jones after Eskelson reported that Jones was moaning in her cell.  Yet, Smith had examined Jones a few hours earlier, at which time Jones was grunting in response to Smith's health-related questions.  Jones's subsequent moaning, therefore, was

consistent with Smith's earlier observations. Eskelson apparently did not provide any new

or additional information to Smith that would have suggested that a re-examination of Jones

was appropriate or that Jones was then suffering from a new or different medical problem.

(Kirscher Aff. Ex. P.)  Moreover, the record is clear that, at the time Eskelson reported

Jones's moaning to Smith, Smith still believed that Jones was feigning her symptoms.  (Id.)

Under these circumstances, no reasonable jury could conclude that Smith knew of, but

consciously disregarded, Jones's serious medical need.[21]

At bottom, prison officials are "free from liability if they responded reasonably to

[a] risk [of serious harm], even if the harm ultimately was not averted."  Farmer, 511 U.S. at

844.  That is precisely the case here.  Accordingly, the individual Defendants are entitled to

summary judgment on Plaintiff's deliberate-indifference claim.

---

[21] Plaintiff also argues that Smith was deliberately indifferent because she failed to perform a
medical assessment on Jones after the staff-assisted, unclothed body search.  (Mem. in Opp'n at 19,
25.)  The record is clear, however, that Smith did in fact perform that assessment.  (Smith Aff. ¶ 9 &
Ex. B.)  Accordingly, Smith's deliberate-indifference claim based on this allegation fails, as does
Plaintiff's claim that Sergeant Hedtke and Lieutenant Westphal are liable for tacitly authorizing Smith's
failure to perform the assessment.  (Mem. in Opp'n at 21-23.)
   At the hearing on Defendants' Motion, Plaintiff argued that Smith lied in her Affidavit and did
not actually perform the post-search medical evaluation.  Yet, Plaintiff cannot employ such speculation
to defeat Defendants' Motion.  Bloom v. Metro Heart Group of St. Louis, Inc., 440 F.3d 1025, 1028
(8th Cir. 2006) ("speculation and conjecture are insufficient to defeat summary judgment"); see also
Fed. R. Civ. P. 56(e) (party opposing summary judgment motion "may not rest upon the mere . . .
denials of the adverse party's" evidence).  This is especially true here because Plaintiff could have
deposed Smith, but chose not to do so.  In any event, even if the Court were to disregard Smith's
Affidavit, her (contemporaneously made) medical records clearly indicate that she performed the
evaluation.

**B.     The excessive-force claim**

Plaintiff next asserts a claim against certain of the individual Defendants for excessive force during the staff-assisted, unclothed body search.  (Mem. in Opp'n at 25-26.)  According to Plaintiff, the use of force was not necessary because Jones had "agreed to cooperate" with the search and "did not resist."  (Id. at 25.)  Simply stated, Plaintiff's argument boils down to the following assertion:  "Since there was no need for force, no force should have been used."  (Id. at 26.)

The Eighth Amendment protects inmates "from the unnecessary and wanton infliction of pain by correctional officers."  Treats v. Morgan, 308 F.3d 868, 872 (8th Cir. 2002).  The "core judicial inquiry" in evaluating an excessive force claim is whether force was applied "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Jones v. Shields, 207 F.3d 491, 495 (8th Cir. 2000) (quoting Hudson v. McMillian, 503 U.S. 1, 6-7 (1992)).  "The test is whether the officer's use of force was reasonable under the circumstances, or whether it was punitive, arbitrary, or malicious."  Treats, 308 F.3d at 873.  In applying that test, courts look at whether "there was an objective need for force, the relationship between any such need and the amount of force used, the threat reasonably perceived by the correctional officers, any efforts by the officers to temper the severity of their forceful response, and the extent of the inmate's injury."  Id. at 872.  "The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of force, provided

21

that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503

U.S. at 9-10.

Here, no reasonable jury could conclude that the use of force during the body search

was unreasonable, punitive, arbitrary, malicious, or repugnant to mankind.  Indeed, the

evidence shows that the individual Defendants repeatedly directed Jones to remove her

clothes for the search, but she failed to comply.  Only after multiple commands to disrobe

did the individual Defendants move Jones to the cot and hold her down while performing

the body search.  The use of force was appropriate in those circumstances.  See, e.g.,

Hudson, 503 U.S. at 7.

Moreover, while Jones can be heard moaning on the videotape of the search, it is

evident from that videotape that the officers involved applied only minimal force to Jones's

back and legs.  Plaintiff has proffered no evidence of any injury that occurred as a result of

the force applied; indeed, Smith noted no injuries when she examined Jones after the

search.[22]  Finally, the Court notes that the purpose of an unclothed body search is to detect

contraband or other items that a prisoner might use to inflict injury on herself, prison staff,

or other inmates.  See Shields, 207 F.3d at 496 ("summary applications of force are

constitutionally permissible when prison security and order, or the safety of other inmates

or officers, has been placed in jeopardy").

---

[22] Although Jones's autopsy report indicates that she had contusions on her body, the report does not indicate the age of the contusions or that they resulted from the search.

22

Applying the factors set forth in <u>Treats</u>, the Court concludes that the individual Defendants are entitled to summary judgment on Plaintiff's excessive-force claim.

### III. The Court declines to exercise supplemental jurisdiction over Plaintiff's state-law wrongful-death claim.

Having concluded that summary judgment must be granted in Defendants' favor on Plaintiff's federal claims, the Court's original jurisdiction has been extinguished. Pursuant to 28 U.S.C. § 1367(c)(3), the Court may, *sua sponte*, decline to exercise supplemental jurisdiction over a pendent state-law claim if it has dismissed all claims over which it has original jurisdiction. <u>Johnson v. City of Shorewood</u>, 360 F.3d 810, 819 (8th Cir. 2004). And, when all federal claims are eliminated before trial, the balance of factors to be considered in deciding whether to exercise supplemental jurisdiction over a pendent state-law claim typically militates against exercising jurisdiction. <u>Id.</u> (citing <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988)). Based on Section 1367(c)(3) and <u>Johnson</u>, the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law wrongful-death claim.

### CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, it is

**ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 37) is **GRANTED**. Plaintiff's federal claims are **DISMISSED WITH PREJUDICE** and Plaintiff's state-law wrongful death claim is **DISMISSED WITHOUT PREJUDICE.**[23]

---

[23] <u>See generally</u> 28 U.S.C. § 1367(d).

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October  31 , 2006                              s/Richard H. Kyle
                                                       RICHARD H. KYLE
                                                       United States District Judge